[Cite as *State v. Wade*, 2018-Ohio-3803.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                :

      Plaintiff-Appellee,          :          No. 17AP-134
                                             (C.P.C. No. 15CR-6089)
v.                                           :          No. 17AP-282
                                             (C.P.C. No. 13CR-1788)
Derrick Wade,                                :

      Defendant-Appellant.         :          (REGULAR CALENDAR)


D E C I S I O N

Rendered on September 20, 2018


**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee.

**On brief**: *Brian J. Rigg*, for appellant.


APPEALS from the Franklin County Court of Common Pleas

BROWN, P.J.

{¶ 1} In these consolidated appeals, defendant-appellant, Derrick Wade, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of murder in case No. 15CR-6089. Appellant also appeals from an entry of the trial court which denied his motion to withdraw guilty plea in case No. 13CR-1788.

{¶ 2} On April 1, 2013, appellant was indicted in case No. 13CR-1788 on two counts of aggravated robbery, in violation of R.C. 2911.01, one count of attempted murder, in violation of R.C. 2923.02 and 2903.02, one count of felonious assault, in violation of R.C. 2903.11, one count of kidnapping, in violation of R.C. 2905.01, one count of carrying a concealed weapon, in violation of R.C. 2923.12, and one count of having a weapon under

disability, in violation of R.C. 2923.13.  Counts one through five each carried a firearm specification.  The alleged victim of the attempted murder charge was Danny Lowe.

{¶ 3}  On January 14, 2014, appellant entered a guilty plea in case No. 13CR-1788 to two counts of aggravated robbery, with specifications, and one count of attempted murder, with specification.  During the hearing, the prosecutor recited the following facts. On the evening of March 23, 2013, at approximately 1:00 a.m., police officers responded to a report of a shooting at a hotel located on West Broad Street.  When officers arrived, they observed the shooting victim, Lowe, in room 503.  Also present in the room was Jessica Devore, Lowe's fiancée, and their four-year-old son.

{¶ 4}  Devore informed police officers she and her family had been living at the hotel for several weeks after being evicted from their home.  They had recently received a tax return of approximately $3,000.  A man across the hall, who had previously smoked marijuana with them, asked if they wanted to purchase some marijuana.  They told him no, but inquired about obtaining Xanax pills as a sleep aid.  Later that evening, appellant and co-defendant, Peter Hunter, appeared at their hotel room and discussed a price for Xanax.

{¶ 5}  Devore told police officers that "at that point, [appellant] pulled out a gun, struck Danny Lowe and demanded his money."  (Jan. 13, 2014 Tr. at 14.)  A struggle ensued, and appellant "shot [Lowe] in the neck.  They were demanding all of their money. They somehow knew they had a large amount of cash in that room."  (Jan. 13, 2014 Tr. at 14.)  The co-defendant, Hunter, then "took the gun and put it to [Devore's] four-year-old's head and said, 'I'm going to kill your child.'  They took the purse."  (Jan. 13, 2014 Tr. at 14.)

{¶ 6}  Following the shooting, police officers observed two black males fleeing the area on foot with the purse.  Appellant and Hunter were subsequently taken into custody. Police officers recovered a Smith & Wesson .38 caliber pistol from appellant's right front pocket, and also recovered two large wads of cash from Hunter.  The officers subsequently discovered that appellant "had been shot himself," but he "didn't tell the officers he had been shot."  (Jan. 13, 2014 Tr. at 14-15.)  At the time of the plea hearing, the prosecutor noted Lowe was still in the hospital and was "paralyzed from the neck down."  (Jan. 13, 2014 Tr. at 15.)

{¶ 7}   On March 24, 2014, the trial court conducted a sentencing hearing.  By entry filed March 27, 2014, the trial court imposed a total sentence of 19 years.

{¶ 8}   The entry of guilty plea form in case No. 13CR-1788 stated in part: "[T]he State reserves the right to prosecute the defendant for aggravated murder or murder, or any other homicide offense that is appropriate in the event that the victim in this case dies as a result of his injuries inflicted during the course of this incident."  In September 2015, Lowe died.

{¶ 9}   On December 11, 2015, appellant was indicted in case No. 15CR-6089 on one count of murder, in violation of R.C. 2903.02.  The indictment included a firearm specification and a repeat violent offender specification.

{¶ 10} On September 28, 2016, appellant filed a motion to dismiss his guilty plea in case No. 13CR-1788.  In the accompanying memorandum in support, appellant argued his guilty plea was not made knowingly, intelligently, and voluntarily, and that he did not understand the charges to which he was pleading.  Plaintiff-appellee, State of Ohio, filed a memorandum contra the motion to withdraw.

{¶ 11} On October 24, 2016, the trial court conducted a hearing on the motion to withdraw guilty plea in case No. 13CR-1788.  During the hearing, appellant testified on his own behalf, while the state called as a witness attorney Paul A. Scott, Jr.  On April 27, 2017, the trial court filed an entry denying the motion to withdraw guilty plea.

{¶ 12} On January 9, 2017, a jury trial began in case No. 15CR-6089.  Prior to trial, the trial court dismissed the repeat violent offender specification.  The first witness for the state was Columbus Police Officer Tim MacLellan.  On March 23, 2013, Officer MacLellan responded to a report of a shooting at the Knights Inn Hotel, located at 1551 West Broad Street.  Upon arriving at the scene, the officer "saw a young four-year-old boy standing in the doorway of * * * one of the rooms for rent."  (Tr. Vol. I at 55.)  The boy "was screaming," and "[t]here was a woman behind him * * * screaming as well in the room."  (Tr. Vol. I at 55.)  The officer also observed "a white male laying on the floor near the bed towards the back of the room."  (Tr. Vol. I at 55.)  The man "appeared to have one shot to his left side of his neck," and there was "a large amount of blood on the floor."  (Tr. Vol. I at 55.)

{¶ 13} The female "was hysterical, screaming about two black men had just robbed her and * * * shot her boyfriend, fiancée."  (Tr. Vol. I at 55.)  Officer MacLellan administered first aid to the male while waiting for medics to arrive.  The officer received a dispatch indicating that officers had detained two black males "within probably a couple hundred feet from the scene in front - - by White Castle, which is just in front of the hotel."  (Tr. Vol. I at 56.)

{¶ 14} Officer MacLellan spoke with Devore and she told the officer "her purse was taken, along with her income tax refund, which was cash."  (Tr. Vol. I at 70.)  Officer MacLellan assisted in securing the scene and discovered a shell casing at the foot of the bed; he subsequently found a pink purse outside on the ground.

{¶ 15} On March 23, 2013, Columbus Police Officer Shane Sprague and his partner, Officer Justin Segna, were dispatched to West Broad Street and provided a description of two male suspects.  Upon arrival to the area, the officers "observed two male blacks in the parking lot" of the White Castle restaurant.  (Tr. Vol. II at 87.)  The two suspects, upon seeing the officers, "kind of split off from each other."  (Tr. Vol. II at 87.)  The officers took the two men, including appellant, into custody, and Officer Sprague recovered a handgun/revolver from appellant's pocket or waistband.  Later, as officers were placing appellant in the police cruiser, they observed "blood drops on the pavement."  (Tr. Vol. II at 90.)  When questioned by officers whether he was injured, appellant responded: "[Y]es, I've been shot."  (Tr. Vol. II at 90.)

{¶ 16} Columbus Police Officer Joseph Albert was dispatched to the scene and assisted another officer in detaining the second suspect, Hunter.  Officer Albert "recovered a wad of $20 bills out of [Hunter's] coat pocket, and the wad was exactly folded in half, had two yellow hair bands on it, one on each end of the wad."  (Tr. Vol. II at 108-09.)  The other officer "recovered ten $20 bills which equaled $200 from Mr. Hunter's pants pocket at the time."  (Tr. Vol. II at 109.)  The two amounts of cash recovered by the officers totaled $2,000, comprised of one hundred $20 bills.

{¶ 17} Donald Jones, a member of the Columbus Police crime scene search unit, performed gunshot residue testing on appellant and Hunter; the testing was subsequently submitted to the Ohio Bureau of Criminal Investigation ("BCI").  At the scene, Jones recovered a revolver, which had "two spent casings and three live rounds."  (Tr. Vol. II at

152.)  He also recovered "the cash, the hair bands, the spent casing, the plastic baggie, the other spent projectile, pill bottle, then the other spent projectile."  (Tr. Vol. II at 152.)

{¶ 18} At trial, the parties entered into three stipulations: (1) that appellant had previously entered a guilty plea to aggravated robbery, a felony of the first degree, and the victim of the aggravated robbery was Lowe, (2) if called to testify, a forensic scientist (Kelby Ducat) would have stated that the Smith & Wesson revolver was operable, and that a bullet recovered from the crime scene was fired from that revolver, and (3) if called to testify, a forensic scientist (Suzanne Nofzinger) would have stated that a gunshot residue kit indicated appellant had gunshot primer residue on both his person and his clothing, meaning that appellant either discharged a firearm, was in the vicinity of a firearm when it was discharged, or handled an item with gunshot primer residue on it.

{¶ 19} On September 3, 2015, Kenneth Gerston, a deputy coroner with the Franklin County Coroner's Office, performed an autopsy on Lowe.  Dr. Gerston testified that Lowe "died from the complications of his wounds, which was sepsis," or "blood poisoning." (Tr. Vol. II at 186.)   Dr. Gerston opined that the gunshot wound Lowe received in March 2013 was the proximate cause of his death on September 2, 2015.

{¶ 20} On cross-examination, Dr. Gerston stated the gunshot wound was on the left side of Lowe's neck and that the projectile traveled through the neck and damaged the spinal cord in a fashion that rendered him a quadriplegic; further, at the moment Lowe was shot "he would be quadriplegic and probably would have difficulty in breathing or wouldn't be able to breathe properly at all."  (Tr. Vol. II at 195.)

{¶ 21} At the close of the state's case-in-chief, defense counsel made a Crim.R. 29 motion for judgment of acquittal.  The trial court denied the motion.

{¶ 22} Columbus Police Detective Arthur Hughes, one of the detectives assigned to the case, was called as a witness on behalf of appellant.  As part of the investigation, Detective Hughes interviewed Devore on two separate occasions.   During the first interview, Devore did not mention a second weapon and the detective noted that police officers did not recover the weapon fired at appellant.  According to Detective Hughes, "[t]he pills were the focus of the whole incident."  (Tr. Vol. II at 221.)

{¶ 23} On cross-examination, Detective Hughes testified that Devore explained during the second interview that Lowe had a weapon in the hotel room for protection.

Devore also explained that she wrapped the $2,000 in yellow hair bands to keep the money separate, with the intent to use the funds to move out of the hotel and into an apartment. The detective agreed the investigation centered on a robbery, and that if anyone was acting in self-defense it was Lowe.

{¶ 24} Appellant testified on his own behalf. Appellant described Hunter as "a guy I know from the neighborhood." (Tr. Vol. II at 247.) On the date of the incident, appellant "was going to a store to buy me a beer and a pack of cigarettes, and I passed [Hunter] going to the store." (Tr. Vol. II at 248.) Hunter "asked me did I know anybody that had some [Xanax] pills. I said I did." (Tr. Vol. II at 249.) Appellant had ten Xanax pills which, according to appellant, sold for $2 each on the street.

{¶ 25} Hunter asked appellant to wait there; Hunter then "went across the street by the hotel and came back about 5, 10 minutes later, said somebody wanted them." (Tr. Vol. II at 250.) Hunter and appellant walked to the hotel room and Lowe, who appellant did not know, invited them inside. Appellant testified that he offered "to sell him the pills," but that "Hunter was trying to add another dollar to the pills." (Tr. Vol. II at 251, 252.)

{¶ 26} According to appellant, Hunter and Lowe "end up getting in a fight, and then [Hunter] punches Danny Lowe in the face." (Tr. Vol. II at 253.) Hunter, who is 6'4" and weighs approximately 300 pounds "almost knocks him out, and [Lowe] stumbles back." (Tr. Vol. II at 254.) Lowe "hit the back wall. And as he hit the back wall, he reaches down his waistline, pulls up and shoots me." (Tr. Vol. II at 256.) Appellant stated that Lowe "came towards me." (Tr. Vol. II at 256.) Appellant testified that "I reached for my gun, and then I pulled it out. * * * I squeeze the trigger and it hits him." (Tr. Vol. II at 257.) Lowe fell to the ground, and appellant fled the hotel room. Appellant ran toward West Broad Street and heard Hunter call his name.

{¶ 27} Appellant denied knowing Hunter had any money; he also denied knowing there was a large amount of cash in the hotel room.

{¶ 28} Following deliberations, the jury returned verdicts finding appellant guilty of murder and the firearm specification. By judgment entry filed February 10, 2017, the trial court sentenced appellant in case No. 15CR-6089 to an indefinite term of 15 years to

life on the murder count, with the sentence to run concurrently with the sentence imposed on Counts 1 and 2 in case No. 13CR-1788.

{¶ 29} Appellant appealed from the entries in both case Nos. 13CR-1788 and 15CR-6089. By journal entry filed August 31, 2017, this court granted a motion by appellant to consolidate the appeals.

{¶ 30} On appeal, appellant sets forth the following three assignments of error for this court's review:

> [I.] APPELLANT WAS DENIED A FAIR TRIAL WHEN A TRIAL JUDGE DENIED A MOTION TO WITHDRAW HIS GUILTY PLEA.
>
> [II.] THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL.
>
> [III.] THE VEREDICT OF GUILTY TO MURDER IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 31} Under the first assignment of error, appellant asserts the trial court erred in denying his motion to withdraw his guilty plea in case No. 13CR-1788. In support, appellant cites his own testimony during the hearing on the motion to withdraw in which he claimed to be unaware the state could use his guilty plea in a subsequent murder trial. Appellant further argues the trial court erred in failing to inform him of his right to have the state prove his guilt beyond a reasonable doubt; appellant contends he did not know the state had the burden of proof in all criminal trials, and that he believed he was required to prove his innocence.

{¶ 32} Crim.R. 32.1 states as follows: "A motion to withdraw a plea of guilty or no contest may be made only before sentence is imposed; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his or her plea."

{¶ 33} In accordance with Crim.R. 32.1 "[a] post-sentence motion to withdraw a guilty plea may be made only to correct a manifest injustice." *State v. Morgan*, 10th Dist. No. 12AP-241, 2012-Ohio-5773, ¶ 10. Under Ohio law, the term " '[m]anifest injustice relates to some fundamental flaw in the proceedings which result[s] in a miscarriage of justice or is inconsistent with the demands of due process.' " *Id.,* quoting *State v.*

*Williams*, 10th Dist. No. 03AP-1214, 2004-Ohio-6123, ¶ 5.  Further, "[a] manifest injustice is an extremely high standard, which permits withdrawal of a plea only in extraordinary cases." *State v. Allen,* 8th Dist. No. 86684, 2006-Ohio-3164, ¶ 10.

{¶ 34} A defendant seeking to withdraw a guilty plea after the imposition of sentence " 'has the burden of establishing the existence of manifest injustice.' " *Morgan* at ¶ 11, quoting *State v. Smith*, 49 Ohio St.2d 261 (1977), paragraph one of the syllabus.  A motion made under Crim.R. 32.1 "is addressed to the sound discretion of the trial court," and therefore "appellate review of the trial court's denial of a post-sentence motion to withdraw a guilty plea is limited to the determination of whether the trial court abused its discretion." *Id.*

{¶ 35} In asserting the trial court did not inform him of the right to have the state prove his guilt beyond a reasonable doubt, appellant cites to the following portion of the plea hearing in which the trial court addressed appellant and stated:

> THE COURT:  By pleading guilty, you're waiving, or giving up, all the following rights: The right to a jury trial of 12 people who would have to unanimously find you guilty beyond a reasonable doubt.
>
> During that trial, you could not be compelled, or forced, to be a witness against yourself.  You would have the right not to incriminate yourself, to stand silent, to require the State to bring in these witnesses to court.
>
> They would come into court, be seated to my left.  You would have the right to see them.  It's called the right of confrontation.  You would have the right to have [counsel] question those witnesses to test the accuracy of what they're saying or testify to.
>
> You would have the right to present defenses.  To present defenses, I could force people to come to court to testify on your behalf.

(Jan. 13, 2014 Tr. at 7-8.)

{¶ 36} Several Ohio appellate courts have considered Crim.R. 11 challenges to pleas involving language similar to that at issue in the instant case.  During the plea colloquy in *State v. Underwood,* 7th Dist. No. 11 MA 170, 2012-Ohio-4263, ¶ 11, the trial court addressed the defendant and stated in part: "You have a right to a jury where all 12 people

have to find you guilty beyond a reasonable doubt of these two counts. You give up that right. You give up the right to make [the prosecutor] prove all the elements that it takes to make up this charge."

{¶ 37} On appeal, the defendant in *Underwood* argued the trial court erred in failing to comply with Crim.R. 11 by not properly informing her she was waiving the right to have the state prove her guilt beyond a reasonable doubt. The reviewing court rejected the defendant's argument, holding in part:

> The plea colloquy demonstrates the trial court did comply with Crim.R. 11. The trial court explained to Underwood her right to a jury trial where the jury would have to find her guilty beyond a reasonable doubt and the State would have the burden of proof in proving the elements of the offense. Although the trial court did not literally recite the language of Crim.R. 11(C)(2)(c), it was not required to do so. The trial court explained the right to have the State prove Underwood's guilt beyond a reasonable doubt "in a manner reasonably intelligible" to her.

*Id.* at ¶ 12.

{¶ 38} In *State v. Elmore,* 7th Dist. No. 08-JE-36, 2009-Ohio-6400, ¶ 13, the trial court stated the following to the defendant during the plea colloquy: " 'Had this case gone to trial * * * you would have a number of trial rights but by your plea of guilty you're waiving or giving up * * * your right to trial by jury and in this case that means that there would have been 12 jurors who could not convict you unless they were unanimously convinced beyond a reasonable doubt of each element of this offense.' "

{¶ 39} On appeal, the defendant argued the trial court failed to comply with Crim.R. 11 by not "specifically mention[ing] the state as the carrier of the burden," thereby invalidating his guilty pleas. *Id.* at ¶ 14. The reviewing court in *Elmore* rejected that argument, holding in part:

> [T]he Ohio Supreme Court has held that failure to use the exact language contained in Crim.R. 11(C) in informing a criminal defendant of his constitutional rights is not grounds for vacating a plea as long as the record shows that the trial court explained these rights in a manner reasonably intelligible to that defendant. *State v. Ballard* (1981), 66 Ohio St.2d 473, * * * paragraph two of the syllabus.

> Following the trial court's advisement, it asked Elmore if he understood the statement, and Elmore answered in the affirmative. Then, subsequent to Elmore's allocution, the court again advised Elmore as follows: "Do you understand a jury could not convict you of this level of this offense unless they were unanimously convinced beyond a reasonable doubt of all the things that you and I just talked about?" * * * Again, Elmore responded to this question in the affirmative. * * * Thus, the trial court did inform Elmore of the state's burden, in a manner reasonably intelligible to him, notwithstanding the omission of identifying the state by name. The only other party to convince the jury would be the state.

*Id.* at ¶ 14-15.

{¶ 40} In the present case, similar to the advisements given in *Elmore* and *Underwood*, the trial court informed appellant that by pleading guilty he was giving up "[t]he right to a jury trial of 12 people who would have to unanimously find you guilty beyond a reasonable doubt." (Jan. 13, 2014 Tr. at 7.) In addition to the plea colloquy, the trial court inquired whether defense counsel had reviewed the entry of guilty plea form with counsel, and appellant stated he and his counsel "went over it together." (Jan. 13, 2014 Tr. at 5.) The plea form informed appellant that, by pleading guilty, he was giving up his right "to require the State to prove my guilt beyond a reasonable doubt."

{¶ 41} Based on this court's review of the record, we agree with the state's argument that the trial court explained to appellant his right to have the state prove his guilt beyond a reasonable doubt in a manner reasonably intelligible to him, notwithstanding the omission of orally identifying the state by name. *Elmore* at ¶ 15. *See also State v. Givens*, 2d Dist. No. 7774 (Sept. 16, 1982) (finding the trial court "referred to appellant's right to have the state prove his guilt beyond a reasonable doubt 'in a manner reasonably intelligible to' appellant" where court advised defendant that "all twelve [jurors] have to find you guilty beyond a reasonable doubt," and court inquired whether appellant understood waiver of rights form he had read).

{¶ 42} We also find unpersuasive appellant's contention the trial court erred in accepting his plea because he was unaware the state could use the plea in a subsequent

murder trial.[1]  This court has previously noted that " 'in order for a plea to be knowing, voluntary, and intelligent, a defendant must only be made aware of the direct consequences of the plea, and the trial court is not required to inform the defendant of all possible collateral consequences.' "  *State v. Radovanic*, 10th Dist. No. 13AP-193, 2013-Ohio-4157, ¶ 15, quoting *State v. Dumas*, 10th Dist. No. 08AP-179, 2008-Ohio-4896, ¶ 14.

{¶ 43} Under Ohio law, "[a] direct consequence of a plea 'is an "immediate and automatic" consequence.' "  *Id.,* quoting *State v. Harris,* 6th Dist. No. E-06-015, 2007-Ohio-6362, ¶ 20.  This court has also held that "[a] plea's possible enhancing effects on any subsequent sentence have been held to be collateral consequences of the conviction and therefore, are not the type of consequences about which a defendant must be advised before defendant enters a guilty plea."  *State v. Southers,* 10th Dist. No. 88AP-528 (Aug. 30, 1988).

{¶ 44} Federal courts have similarly recognized that " '[c]ertain possible consequences of a guilty plea are "collateral" rather than direct and need not be explained to the defendant in order to ensure that the plea is voluntary.' "  *United States v. Youngs,* 687 F.3d 56, 60 (2d Cir.2012), quoting *United States v. United States Currency in the Amount of $228,536.00*, 895 F.2d 908, 915 (2d Cir.1990). Further, courts in other jurisdictions have held that the use of a guilty plea in a subsequent murder trial, following the death of the victim, was not a direct consequence of the plea for which the defendant must be advised. *See Murden v. Artuz,* 253 F.Supp.2d 376, 381 (E.D.N.Y.2001) (defendant's guilty plea to arson, later introduced in murder trial after arson victim died, was not "an 'immediate' or a 'definite' consequence of his plea" as it was contingent upon, not only death of victim two years later, but also the independent decision of the state to prosecute defendant for murder); *People v. Carromero,* 16 N.Y.S.3d 708, 712 (2015) (use of defendant's plea to attempted murder in subsequent murder trial after victim died was a "collateral consequence" of defendant's plea).

{¶ 45} In the instant case, in denying appellant's motion to withdraw in case No. 13CR-1788, the trial court found the use of the guilty plea in a subsequent proceeding was "a collateral consequence" and, therefore, did not require advisement at the time of the

---

[1] We note appellant does not argue he was unaware of the fact the state reserved the right to charge him with murder in the event the victim died as a proximate result of the injuries inflicted by the shooting.  A review of the 2014 plea hearing reflects the trial court fully addressed this issue with appellant.

plea.  (Oct. 24, 2016 Tr. at 89.)  We agree and find no merit to appellant's contention that the trial court erred in failing to advise him that his guilty plea could be used in a subsequent murder trial.

{¶ 46} Upon review of the record, appellant has failed to demonstrate that withdrawal of his guilty plea was necessary to correct a manifest injustice.  Accordingly, the trial court did not abuse its discretion in denying appellant's motion to withdraw his guilty plea.

{¶ 47} Appellant's first assignment of error is not well-taken and is overruled.

{¶ 48} Appellant's second and third assignments of error are interrelated and will be considered together.  Under these assignments of error, appellant challenges both the sufficiency and the weight of the evidence in support of his conviction for murder.  More specifically, appellant argues the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal, and that the jury created a manifest miscarriage of justice by finding him guilty of murder.

{¶ 49} In general, "[a] motion for judgment of acquittal, pursuant to Crim.R. 29, tests the sufficiency of the evidence."  *State v. Darrington,* 10th Dist. No. 06AP-160, 2006-Ohio-5042, ¶ 15.  Thus, "an appellate court reviews a trial court's denial of a motion for acquittal using the same standard for reviewing a sufficiency of the evidence claim." *Id.*  The test for sufficiency is whether, "after viewing the probative evidence and the inference drawn from it, in the light most favorable to the prosecution, any rational trier of fact could find that all of the elements of the charged offense were proven beyond a reasonable doubt." *State v. Freeman,* 11th Dist. No. 2001-A-0053, 2002-Ohio-3366, ¶ 6.

{¶ 50} Appellant's sufficiency and manifest weight arguments are both premised solely on his claim of self-defense.  Appellant points to testimony by Dr. Gerston stating that Lowe would have been instantly paralyzed the moment he sustained the gunshot wound to the neck.  Appellant maintains this evidence is consistent with his statement to a detective that he was shot first and then returned fire with his own weapon in self-defense.

{¶ 51} As noted, appellant was convicted in case No. 15CR-6089 of one count of murder, in violation of R.C. 2903.02.  Pursuant to R.C. 2903.02(B) "[n]o person shall cause the death of another as a proximate result of the offender's committing or

attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."  At trial, the parties stipulated appellant had previously entered a guilty plea to aggravated robbery, a felony of the first degree.  Under Ohio law, aggravated robbery is both a felony of the first degree and "an offense of violence."  *State v. Munn*, 6th Dist. No. L-08-1363, 2009-Ohio-5870, ¶ 45.

{¶ 52} In order to establish self-defense, a defendant is required to prove the following elements: "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger."  *State v. Barnes,* 94 Ohio St.3d 21, 24 (2002), citing *State v. Robbins,* 58 Ohio St.2d 74 (1979), paragraph two of the syllabus.  The Supreme Court of Ohio has held that "the elements of self-defense are cumulative."  *State v. Jackson,* 22 Ohio St.3d 281, 284 (1986).  Thus, if a defendant fails to prove "*any one* of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense."  (Emphasis sic.) *Id.*

{¶ 53} In response to appellant's sufficiency argument, the state maintains that a challenge to the sufficiency of the evidence is inapplicable to an affirmative defense such as self-defense.  We agree.

{¶ 54} Under Ohio law, "[s]elf-defense is an affirmative defense."  *State v. Gripper,* 10th Dist. No. 12AP-396, 2013-Ohio-2740, ¶ 24, citing *State v. Campbell*, 10th Dist. No. 07AP-1001, 2008-Ohio-4831, ¶ 21.  A court's review "for sufficiency of the evidence does not apply to affirmative defenses, because this review does not consider the strength of defense evidence."  *Id.,* citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 37.  In this respect, " '[t]he elements of the crime and the existence of self-defense are separate issues.  Self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged.' "  *State v. Roundtree,* 6th Dist. No. L-14-1052, 2015-Ohio-2230, ¶ 25, quoting *State v. Martin*, 21 Ohio St.3d 91, 94 (1986).  Accordingly, "appellant cannot challenge the jury's rejection of his claim of self-defense on the ground of sufficiency of the evidence."  *Gripper* at ¶ 24.  *See also State v. Johnson,* 10th Dist. No.

06AP-878, 2007-Ohio-2595, ¶ 31 (finding "no merit to appellant's claim that her murder conviction is based on insufficient evidence under the theory that she acted in self-defense").

{¶ 55} Instead, an appellate court "considers self-defense under a manifest weight challenge." *State v. Cruz-Altunar*, 10th Dist. No. 11AP-1114, 2012-Ohio-4833, ¶ 12, citing *State v. Hamilton*, 10th Dist. No. 11AP-981, 2012-Ohio-2995, ¶ 16.   In considering a manifest weight of the evidence challenge, "we weigh the evidence to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at ¶ 13.   Further, "[t]he trier of fact is afforded great deference in our review," and we will reverse a conviction on manifest weight grounds "for only the most exceptional case in which the evidence weighs heavily against a conviction." *Id.*

{¶ 56} As noted, appellant contends the coroner's (Dr. Gerston's) testimony supports his claim that he fired his weapon only after he was first shot by Lowe. Appellant also relies on his own testimony that he was only in the hotel room to sell pills and he was unaware a robbery was going to take place.

{¶ 57} At trial, the state's theory of the case was that appellant and Hunter knew of the large amount of cash in the room and used the pretense of selling Xanax pills to get inside to commit the robbery.   During closing arguments, the state portrayed appellant, who entered the room with a weapon, as the "muscle in the robbery."  (Tr. Vol. III at 326.) By contrast, the prosecutor portrayed the co-defendant, Hunter, as the "grab guy."  (Tr. Vol. III at 323.)   According to the state, appellant was shot by Lowe because appellant pulled out a weapon to rob Lowe and his fiancée, i.e., Lowe did not aim at the co-defendant but rather at the individual (appellant) who was threatening him with a weapon.

{¶ 58} We note there was conflicting evidence as to how many shots appellant fired during the incident.   While appellant testified at trial he only fired one shot at Lowe, he acknowledged on cross-examination to a detective that he shot his weapon twice at Lowe. However, accepting appellant's testimony that Lowe fired first, the trier of fact could have rejected appellant's self-defense theory and reasonably concluded, after weighing the evidence, that appellant failed to show by a preponderance of the evidence he was not at

fault in creating the situation giving rise to the affray (i.e., there was evidence that, if believed, indicated appellant created the situation that gave rise to the confrontation by entering the hotel room with a weapon to participate in a robbery).

{¶ 59} Here, the jury was not required to accept appellant's explanation of events, including his claims he was unaware the victims had a large amount of cash in the hotel room or that a robbery was going to take place. Following the shooting and robbery, police officers arriving at the scene observed both appellant and Hunter together, and a rational trier of fact could have found appellant and the co-defendant acted in concert and remained together after the incident to share in the money taken from the victims. *See State v. Johnson,* 93 Ohio St.3d 240, 245 (2001), quoting *State v. Pruett,* 28 Ohio App.2d 29, 34 (4th Dist.1971) (" 'participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed' "). As noted by the state, there was also evidence indicating appellant waited several hours before acknowledging to police officers that he had been shot, arguably evincing consciousness of guilt and undermining his claim that he only acted in self-defense. *See State v. Williams*, 79 Ohio St.3d 1, 11 (1997), quoting *State v. Eaton,* 19 Ohio St.2d 145, 160 (1969), *vacated on other grounds*, 408 U.S. 935 (1972) (" 'It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.' ").

{¶ 60} Based on this court's review, the jury did not lose its way and create a manifest miscarriage of justice in rejecting appellant's claim of self-defense. Accordingly, appellant's conviction is not against the manifest weight of the evidence. Appellant's second and third assignments of error are not well-taken and are overruled.

{¶ 61} Based on the foregoing, appellant's three assignments of error are overruled, and the judgments of the Franklin County Court of Common Pleas are affirmed.

*Judgments affirmed.*

SADLER and LUPER SCHUSTER, JJ., concur.

_____